This is a video of the City of Venice, Florida.  Take your time in setting up our our last case this morning is number 22-12878 Kenneth Webb versus the City of Venice. Mr. Leavitt, whenever you're ready. Thank you, Your Honor. May it please the Court, I'm Mark Leavitt, my co-counsel is Mark Sugarman. We're here today on behalf of the City of Venice, the defendant appellant in this case, and as the Court knows, we're reserving five minutes for rebuttal. This case is about the parameters of a Title VII hostile work environment claim. As you know, this is a statute that creates a cause of action for a certain conduct, but that conduct must be so extreme that it amounts to a change in the terms and conditions of employment. What this case is not about is a civility code, as many of your decisions have so stated. May I ask you a question? We're procedurally here after a jury trial. This is not a summary judgment. That's true. The jury acted as finders of fact in this case, and they made credibility determinations, and you agree that we cannot review those credibility determinations? In a sense, you cannot review credibility determinations, that's true, but the essence of our case is that they considered evidence that clearly is not indicative of a racially hostile environment, yet the Court permitted that evidence in. When we break down or parse through the different elements or the different incidents that they talk about, and I could talk about just a few of the most egregious, one can see that the judge permitted testimony that does not, as a matter of law, support such a verdict. If I could move on to a couple of those. But not all evidence that is admissible at trial needs to be claim determinative. You build up evidence for a claim block by block, and what may seem to be an isolated piece of evidence, in and of itself may not be enough to establish a Title VII claim of any kind, including a hostile work environment claim, but it's part of the puzzle of why there's enough or not enough. I don't understand the argument that you could only admit evidence that would have been determinative of the hostile work environment claim. Not determinative, but it has to have some bearing upon a racial connotation. If I may give one example, one of the incidents they rely upon is a statement during a briefing where the sergeant says to the plaintiff, Officer Webb, after he has to speak to another supervisor, and he says, when you're done sucking his dick, you can suck mine, too. That's what you all do. There's absolutely no racial connotation to that. No reasonable person objectively can look at that and say, oh, that invokes some type of racial connotation. You're looking at that statement in isolation, and you're not looking at it in the light of all of the other interactions that were had with Sergeant Gregory. When you look at the range of interactions between them, it seems to me, only for me, I don't speak for Judge Hull or Judge Lagoa, that a jury could take that as having racial animus. Now, that's a different question than whether or not the evidence is sufficient. But in terms of evidentiary admission, you don't look at evidence in a vacuum and isolate that statement and then say, if all I had was that, would someone infer racial animus? You look at it in context of the entire trial, and you've got, I mean, I want to make sure, you've got Sergeant Gregory making at least three racially based comments and statements overtly to Mr. Webb, right? I don't know, I believe there's only one that, the only one is in 2018, where he was upset with him because he gave his daughter a ticket, and assuming the jury believes it, because Sergeant Gregoire denies it, but we understand the jury can believe it, he said, he was mad at him and confronted him and said, I should kick your black ass. Didn't he also, again, taken in the context of everything, they're out at Venice Island, and he decides to tell Mr. Webb about a former ordinance, now repealed, that didn't allow black citizens or residents to be on the island after sunset. And he said, you know, one of three things can happen if you're found here or you were found here. How could that not be taken by a reasonable jury, given the verdict, as having some sort of racial connotation? I think that was just an off-the-cuff thing, like, oh, let's make small talk. Of course, Gregoire testified that another black officer told him that story, but besides that, he did say it. There's no date or time associated with that. The plaintiff could not give any date or time. So within the confines of his four or five-year career, we don't know when that happened. So looking at it, that incident at the briefing, that's the first thing that happens in December 2017. I want to ask you about that incident. You're talking about the roll call, December 2017? Yes. Okay. I thought Mr. Webb testified why he thought the comment you just referred to had racial overtones, or at least was derogatory, was because the first black Venice Police Department officer was gay. Is that not Mr. Webb? I don't know if that's true or not, but Mr. Webb testified that he was the second black police officer, right? I don't know if he was the second one. There is another one, but he did reference a prior retired black police officer. All right. And he was gay. And he said that's why I thought that comment you just said that didn't have a racial word in it, he said that's why he took that comment to be derogatory. That's correct, right? That's what he said, yes. So you have to, again, put it in context when they're doing that comment, derogatory comment you just said. He said that was clearly, I felt, a reference to the first black police officer who was gay. That's right. Because he's saying that's what y'all like to do. So it was a hideous comment, right? Absolutely uncivil. Okay. And how it gets a racial overtone is because of the whole context. That's what we're trying to get you to recognize. You just can't take this as an isolated. If I may explain. And clean it up like that. That's why there's a subjective and an objective component. We are arguing it is not objectively. A reasonable person would not go there. He did testify it conjured up in his mind a former retired police officer who is black and gay. So, first of all, he never worked with him. He doesn't even know him. But that's what his subjective thought went to. How about the person who said that Mr. Gregory, he knew him and he worked with him. Well, there's no evidence in the record, quite frankly, that that's true. That officer retired more than 20 years ago. And I don't know that the sergeant overlapped that. But everybody knew who that person was. Anyway, we draw inferences here. Our argument is it's not objectively reasonable to think of a longtime retired, 20 years ago, black, gay police officer. And why would it be black? It's not objectively reasonable to make the comment in the first place. Well, as the bedrock principle is uncivil, boorish, improper, inappropriate comments are not protected by Title VII. It is not a civility code. So we are not saying he was a proper commenter. Let's even take that out. It's still inappropriate to this black police officer to say that's what y'all like to do. I mean, that was to him. But you all, why isn't that a homophobic comment? I mean, sucking dick would be a homophobic comment. It has nothing to do with race. This is not a sex case or... Taken in isolation, maybe. But not if you look at it in the context of all of the evidence presented in light of the jury verdict. And we've got to draw all reasonable inferences in light of that verdict. The other point is that in terms of the hostile work environment, a number of these incidents are not co-employee to co-employee. It's supervisor to subordinate. And, you know, as a general matter, that's important. This is not, you know, someone who is co-equal to you, giving you a hard time and making your daily life harder. It's a supervisor. And that matters, too, in the mix, right? Looking at whether it's objectively you have to look, I agree with total circumstance. That's the first thing that happened in December 2017. Five months later, April 2018, five months later is when the comment was made by Gregoire. So at the time the comment was made five months earlier, there was no context, there was no racial connotation, there was no use of any inappropriate words. So we're talking about six months later. So let's assume, Your Honors, that a handful of these happened and that one could say... We have to assume they all happened. I think some of them are pretty weak. I would question, if I was a juror, did that really happen? There's lack of date and time. There are other problems with them. So I think there's some questionable testimony here about whether this ever really happened. But the problem is we have to accept the jury's credibility findings. That's the problem here. I understand that. And we have to say that they believed every single word the plaintiff said. That's what we have to do. Every single word. We have to assume they believed every word, right? Yes, ma'am, that's indicative of race discrimination. You can't take the fact that the sky is blue, oh, I think that must be... Or the sky is black, and I'm black, so therefore it's racial. It has to have some relationship. And again, when you're looking at them, when you're determining whether it's severe, that's what this case comes down to, whether it's severe. This court has found, for example, the Barrow case, where they found numerous examples of KKK graffiti, the use of the N-word, threatening to kick someone's black ass. The Barrow case, was that a jury trial or a summary judgment? I believe it was a jury trial. I believe it was a jury trial, but all that evidence would not have been necessarily there. I believe it is. But the court there said all that rebel flag, use of the N-word, calling someone a dumbass, referring to them as black boy, again, a noose in a locker, that still was not severe. We're not saying it's proper. We're not saying those things should have been said or those things should have been done. But the focus here, in order to reverse this, is you need to find, and we're asking you to find, that it's not severe or pervasive. It's not so, even if that roll call vote somehow objectively could be considered racist. Six months later is the next time at the N-word, an isolated, one-time use. The evidence is, there's no evidence that Sergeant Gregoire ever used it before or ever used it after. One-time, isolated, stray remark that, not really even calling him names, but saying, I should kick your black ass, because he was upset at him. Inappropriately, uncivil, shouldn't have done it. But that's six months later. Remind me of the overall time frame here, how long we're talking about, from when to when? We're talking about about four years, from 2017 to 2021. And you're talking about a handful of incidents. What months? December 2017? December 2017. To when in 2021? Well, there's not an exact date, Your Honors. Again, an incident. They allege there was a complaint in 2020 that he denominated as hostile work environment. Yet, there is no reference of race in that complaint. It was about getting a reprimand or sending an email. So it's through up to 2021. So you're talking about at least three years, 2018, 19, 20, and up to 21, three to four years. And you're talking about, let's assume, the incident at the roll call. Six months later, one incident. Isolated, stray remark of the use of the N-word or saying I'm going to kick your black ass. No other derogatory terms. There's only one actual cognizable claim of an inappropriate, uncivil, racial comment. After that, there's no other use of a racial term or anything like that. I'm speaking for myself. The jury was instructed as to all this conduct, and they were asked whether the conduct in this case was severe or pervasive, that it materially altered the terms or conditions of Officer Webb's employment. And then it talked about how you should consider all the circumstances, how often the discriminatory conduct occurred, severity, on and on. So really what, in essence, you're doing is challenging the jury's verdict form and their determination that they found that it was severe or pervasive. But there has to be sufficient evidence to warrant that finding. The judge gave the 11th Circuit pattern instruction for severe and pervasive. That doesn't mean they followed it, and it doesn't mean that the evidence that came in warranted it. Your argument truly is, at the bottom line, is a sufficiency of the evidence, that there is no sufficient evidence to satisfy the severe or pervasive element that's required. On the objective standard, that's our primary argument, yes. You're feeling the denial of emotion for judgment is a matter of law. Right, absolutely. It's really a summary judgment standard, but even more so because we've got credibility findings, so we can strew everything in the favor of the plaintiff. That's true, but it has to be objectively racial, objectively severe. And so much of this is not objectively. And I'll comment. We've taken you way over your time, and it's on our dime and not yours. So if you'd like to wrap up, you've got 30 seconds to do so, and that way you can save all of your time for rebuttal. All right, the primary other argument I want to raise that was an error to admit into evidence was the Black Suspect book. He testified that he found on a bookshelf in a storeroom a book called Black Suspects. I thought it was on a detective's bookshelf. On a bookshelf, I believe, in a storeroom, but it's not in a working room. And the evidence undisputed is it wasn't given to him. People use it. If that book is in a detective's bookshelf, it's used. It's not used, and the undisputed testimony is... Why was it there then? Officer Webb says he's never used it. Why was it there then? From 30 years ago. And when 30 years ago, when life was very different... Yes, absolutely. ...and social mores were very, very different, then someone has left it there. Right, and the chief testified he'd been there 20 years. He's never seen it. He didn't know it was there. He's never used it. And the jury could have disbelieved him. Well, even Officer Webb said he's never used it or seen it before, and it never was presented to him. It was a relic of the past, and clearly any probative value, we believe, was outweighed by the prejudice. Okay, we understand. Okay, that's our argument there, so I'll reserve the rest of my time. Thank you. Okay, thank you, Mr. Levitt. Good morning. Ms. MacMajka, is that...? Micah, like for Micah. Like for Micah, okay. Yes. Good morning. May it please the court, counsel. My name is Jacqueline MacMajka. I am here on behalf of Officer Kenneth Webb, who remains employed. Dealing with the... Where was the black notebook? What does the record say? The record says that the black suspect's book was kept on a shelf in the detective's room where they... It's the detective's room. That's also where the THI equipment was stored. Officer Webb had applied to become a traffic homicide investigator, and he was given the job on a part-time basis. What is the THC equipment? Traffic homicide investigator. I'm sorry for the acronyms. That's okay. I got it. You can move on with your argument. So when Officer Webb first obtained this position, he became aware of the black suspect's book, and he took some pictures of it. The book itself has the tape on the outside that comes from one of those little old handheld things that raise the letters on a piece of plastic strip. I'm not even sure what they're called. The issue with the black suspect's book is it contained only black suspects. They were suspects from the 70s and 80s. In fact, then-Chief Matt Mueller testified. You've answered my question. You should go back to your argument. That's enough of this. We got the book. Okay. Dealing with the court's decision on the motion for judgment of a matter of law and the motion for a new trial, Judge Barber was correct. This was a jury trial. The jury was made up, as Judge Barber notes, of folks that were in higher management. One, in fact, sat on the jury was an HR director for a corporation. Another was a nurse. These were folks that had a clue about what Title VII meant. When you're looking at whether a hostile work environment has been created, in the city of Venice, the rules and regulations controlling the police department, the standards of procedure, it was in our record, I believe it was SOP 114, says that if a supervisor observes actionable behavior, they have a duty to act. This is not in the context of the tangible employment type action, as Judge Barber notes in his footnote 8, under events versus state, or ball state. This is for purposes of direct liability, whether the individuals were authorized to address and report harassment. There is no doubt. Let's talk about Judge Barber, even without a transfer, she said, was able to lay out the evidence that he recalled in the file in his notes that supported the jury's verdict. Yes, sir. Can I talk to you about one of those? Sure. It's the very first one. A police officer is told by a supervisor, a black police officer by a supervisor, to remove racially based graffiti on a place in a public park. Why is that problematic? I can tell you why. Because the city of Venice has a, it's a hate crime. And it's on public property. Black police officers investigating. But if there was no investigation, it was covered up. That's the point. Oh, your claim was not that he was made to do it and that was demeaning, but that it was a cover up? Well, it was demeaning to him. He objected to it. He asked the Lieutenant Chapa to call public works. She said they weren't in. And she said at the time that they weren't working on Christmas. However, at trial, under direct testimony, because she was our witness, she admitted that there would have been one public works employee on call during Christmas. If she had called the public works employee, that would have also been a cover up? It should have been investigated. Yes, it would have been a cover up. And it would have been racially demeaning to him? No, that actually, Mr. Officer Webb discovered the word nigger. If he calls it in and his supervisor gets the single public works employee who's working on Christmas Day to go take it off, would that have been actionable? Not from Mr. Webb's position. So what really mattered is not the cleaning up. It's that he was ordered to do the cleaning up. After he objected. If a white police officer objects to being given the same instruction, is that problematic? I think the lack of an investigation is problematic, but a white police officer... You're telling me it's not the cover up. A white police officer would not have the same effect on a white police officer as it would on an African American police officer. That just seemed to be one of the weakest points in your favor. Not that it's determinative, but police officers do a fair number of things that are not wonderful in the normal course of events. And they're asked to do some things that are unpleasant, arrest people, put their lives at risk, try to provide aid to those who need it, etc., etc. It's not a job for the faint of heart. Absolutely not. As I said when I started, Officer Webb is a very brave man. He's still working there. So would it have the same effect on a white officer? I don't know. I don't represent a white officer. I represent a black officer who testified. Wasn't there evidence, and maybe there was contrary evidence too, but I thought there was evidence as described in the briefs that Officer Webb's supervisor had also told a white police officer to do the same thing, which suggests that she treated black and white police officers the same way with regard to this sort of problem. Are you talking about this specific incident? No, another incident like it when there was also racial graffiti somewhere else. What I read from the briefs was she also asked another white police officer to do the same thing that Officer Webb had been asked to do. And the jury was free to take that into consideration, and they did. And they found in favor of Officer Webb. They believed his testimony about how it made him feel. They've got to disbelieve that and believe some other things. We don't know what they believe. Well, this is true. We can't get into their minds. I think the question is whether we can even, if they believed him, could we even count that as objective harassment. I think that's the issue. I understand the court's concern. Both white and African-American police officers are asked to do the same thing. I understand the court's concern. But at the same time, it can provide context. I don't know how it provides context if both black and white are asked to do it. Anyway, go ahead. Moving forward into the next incident was the incident at roll call. Well, I have to disagree respectfully with opposing counsel. The testimony at trial from Sergeant Gregoire was that he knew Officer Whitaker. They served together on the FOP. They were at some FOP function. Is Officer Whitaker the one that had retired? He's the homosexual black male that retired. That's who he is. Okay. So, Sergeant Gregoire testified that that's where he became aware of it. Did he testify he knew of Whitaker or knew or had— He testified he served on the same FOP board, went to the same FOP two-day— They have a two-day Bill of Rights ethics type— Anyway, Webb knows Whitaker. Yeah, Webb knows Whitaker and Gregoire knew Whitaker, absolutely. I think that covers it. Okay. So, moving on to the— I mean, it gives you the basis for why he thought it was racial. Right, because it was the only other black male officer. There was a black female officer that was an SRO at that time. But she was on the same squad with Officer Webb. The sergeant that overheard the remarks, Officer Webb approached him and said, What are you going to do about this? And he said, Sometimes we say inappropriate things. This is a lieutenant. So, to say that Officer Webb never complained before 2020 ignores these complaints, contemporaneous complaints. The incident I want to touch on occurred in May of 2018 after the traffic accident. At the police station, the testimony was, and it was disputed by the defense, that a Sergeant Gregoire lunged at the plaintiff, threatening him, I should F your black ass up. Lieutenant Todrash interceded, moved between Gregoire and Officer Webb. As Gregoire moved away, he called out, I hate you, you fucking N word. All of this occurred in front of Lieutenant Resch. The plaintiff asked Resch if he was going to take action, but Resch did nothing. At trial— I think some of the strongest points in the jury's, in favor of the jury's verdict are at least some of these more severe events were the conduct or statements of a supervisor, and then when this Officer Webb complained, it fits into a mosaic which the jury is certainly free to consider. That's really the ultimate conclusion that Officer Webb's side has in this case. The N word has been found by the Supreme Court to be one of the most hateful words that can be said, especially in an employment setting and coupled with the threat of physical violence in front of other members of his colleagues. Now, Lieutenant Resch appeared by videoconference because he had retired. He denied that the event occurred. We published our pretrial request for admissions, which had specifically asked that did plaintiff approach Lieutenant Resch after this event occurred and did— did Lieutenant Resch say, I'm not here for that or do nothing, essentially. The defense admitted that pretrial, so the jury was free to take that admission, a pretrial admission, and weigh it against Lieutenant Resch's denial that the event had never occurred. Those conflicts are jury questions. The court knows it's not a super jury, as Judge Barbara acknowledged. As far as the other events that are listed here, I think we've gone over most of them. The plaintiff testified that he became depressed and anxious. His relationship with Officer Long, who he shared a patrol car with, was hostile. He no longer trusted his white co-workers to back him up. I mean, as the court noted, being a police officer is not the safest job. And he believed that Sergeant Gregoire was trying to set him up when—  Again, it's to provide context to the events that we have designated, actually Judge Barbara designated, occurring from December 17th through April, May of 2018. So the events that surround that, the jury was free to consider, although they may not be actionable, they provide the context that the Supreme Court of the United States has found appropriate in hostile work environment cases. I have one minute left, and if there are no questions, I will rest on my brief. All right. Thank you so much. Thank you very much for your attention. May it please the court, thank you for my additional time. There's a lot to unpack here, so I'm going to hit some key points, we believe are key points. Again, this court has to focus on the objective, reasonable belief. Mr. Officer Webb testified, I thought of the black officer. Mr. Webb testified, certain things happen. But you have to look at objectively and whether it's severe, which encompasses the totality of circumstances over a period of time. And when you look at case after case after case, this court late last year did the Yelling case and found it was insufficient. But let me address a couple of things. Your Honor hit on a very good point on the Jetty situation. Is that indicative of race discrimination, that she asked an officer who was working that zone and received the report to clear the rock rather than let it sit there for a week for the world to see, said let's get this off of here, you need to do that. But there was also no investigation of the incident, right? There was not, but that's not even, so we didn't investigate. Why isn't that problematic for you? Well, because it's not indicative of racial. Officer Webb is the officer who initiates the report and initiates the investigation, and he didn't do that. He's supposed to investigate after the supervisor has told him to clean it off? He received the report from the citizen. He's the one who reported it, and as the on-duty officer, he was to prepare a report and decide whether there should be charges, whether it was a hate crime. Charges against whom? We don't know. There was evidence at trial that he was the one who personally decided not to investigate? There was evidence that he was charged with filing a report and never filed a report, but we don't know the charge. There was no evidence that the supervisor was the one who decided not to proceed further with an investigation? Not necessarily. If there was no report, there was nothing to do, but that doesn't tie in. See, that's the problem. That's too much of a jump to say now we're saying it wasn't investigated because, oh, it was just the end word, we don't need to investigate. There's no evidence of that. They can't make that leap. That's pure conjecture and speculation. But if you ask someone to spoil the evidence, because obviously that is evidence on the wall of a hate crime, and you ask someone to get rid of it, then you're asking someone to get rid of the evidence. So clearly, by definition, you don't want that investigated. Well, Your Honor, first of all, he took a picture, which he did not disclose in discovery, almost at trial, that there was a picture of the rocks that did end up going in evidence. He's the initial investigating officer. It was reported to him. He had to go look at it and write a report. He took a picture. So when did the supervisor tell him to clean it up? I'm sorry? When did the supervisor tell him to clean it up? Upon report, she said, get some paint and go clean it up. That day. And he had a picture. And he didn't submit it with a report. He said, here it is. It should be investigated. And now you're getting into... He did file a report? He did not file a report. Did not submit pictures. But he made an oral report to the supervisor. He called and said, there's the end word here. It's been reported to me by a citizen. I've seen it. What do you want me to do? Go get some paint and clean it up. The same as Your Honor pointed out, another witness testified. Both the lieutenant and the witness themselves said, I've cleaned up graffiti before, too. He's the on-duty officer in his own. There's only two officers on duty. This is not the city of Jacksonville with 500 officers running around. There's two officers. He is assigned to the island. And that was his work area. So I think this court needs to focus on what's objective and then the severity. How many incidents should we consider? Okay. The biggest stretch, consider the incident at the staff meeting. No use to the word, the end word. No other person in the world, I venture to say, mind would go where Officer Webb's mind went. That's fine. It went there subjectively. But objectively, no officer would think he's talking about Officer Whitaker, the retired police officer from 20 years ago who was gay and black. It is not objectively reasonable. And that's where the court has to focus. And then look what they talked about. Six months later was the incident. Six months. I don't believe there's a case when you talk about proximity or severity over a period of time, various isolated statements over a period of years. This is six months later. And the suspect book is another two years later. No. 2020, I believe she just said. No, no, no. The evidence according to Judge Barber's recollection and statement, and I haven't seen anything in the briefs to contradict this, is that it was there through 2020. Right. When the City of Venice Police Department moved offices. Right. That doesn't mean that it popped up for the first time in 2020. It had been there before and stayed there through 2020. Probably there for 30 years back to 1970. Which means it was there in 17 and it was there in 18 and it was there in 19. But Officer Webb testified he saw it in 2020. So that's interesting. It's there in plain sight apparently. And he's worked there since about 2015. And he never saw the book. He never. This is the first time he saw it. He didn't say, I've been looking at this for five years. That's the first time he saw the book. And interestingly, by his own admission, he never reported it. Never went to anyone and said, what is this black suspect book? So the chief could explain, oh, God, I didn't even know I was there. I have never seen that. We don't use that. You don't use that. Officer Webb admitted he doesn't use it. Had never seen it before. So if it had been there, why didn't he see it in 2018 and 2017? OK, Mr. Levitt. Thank you, Your Honor. We do ask you to look at the objective considerations and the severity issue. Also, the possibility, as this court said, that very limited evidence for a new trial. Of course, the court may weigh, the judge may weigh. We're not going to go into new arguments that you haven't pressed in your initial time and your rebuttal time. You can wrap up if you want. You haven't addressed a whole new trial issue in all of your time, which is your decision to make. But asking you to wrap up is not an opportunity to bring up the new trial issue, which is a separate issue on appeal. Your Honor, there's a lot of argument. I rely on our brief. There's a lot of things I highlighted in the 10 minutes I had. This court asked me a lot of questions. I couldn't hit every argument in 10 or 15 minutes. Hold on. No appellate lawyer is expected to do that. And every argument that you've made in your brief is preserved, and we will deal with it. So it's not a criticism. You focus on the things that you think are most important, that you can talk about in a very limited amount of time. You can't get to everything. My only point is, since you're way over your rebuttal time and you went over your initial time, because of our questioning, the wrap-up is not the opportunity to raise an issue that your opponent is not going to have a chance to reply to. I understand. Thank you, Your Honors. I appreciate your time. Okay. Thank you both very much. It's been helpful. We're in recess until tomorrow. All rise.